## LUCAS v. MILLIKEN et al.

### (Circuit Court, D. South Carolina. July 26, 1905.)

1. REMOVAL OF CAUSES—DIVERSITY OF CITIZENSHIP—FORMAL PARTIES.
     A bill for specific performance of a contract for the sale to complainant of certain shares of the issued stock of a corporation, and to recover damages for its breach, which does not allege the insolvency of the other party to the contract, nor that he is about to dispose of the stock, does not state any cause of action against the corporation, which is not an indispensable nor a necessary party. If joined, it is merely a formal party, and its presence, although a citizen of the same state as complainant, will not defeat the right of the real defendant to remove the cause, where it is otherwise removable.
     [Ed. Note.—Diverse citizenship as a ground of federal jurisdiction, see notes to Shipp v. Williams, 10 C. C. A. 249; Mason v. Dullagham, 27 C. C. A. 298.]

2. SAME—REALIGNMENT OF PARTIES—INTEREST AS SHOWN BY PLEADINGS.
     In a suit by a stockholder of a corporation against the corporation and other stockholders to prevent the consummation of an alleged conspiracy by the latter to obtain control of the corporation for the purpose of canceling or terminating a contract made by the corporation, and alleged to be for its benefit, and substituting another, by which the conspirators would profit at the expense of the company and its other stockholders, the corporation must be aligned with the complainant for the purpose of determining the removability of the cause, in accordance with its interest as shown by the bill, and especially where it adopts the allegations of the bill by its answer.

3. CORPORATIONS—LEGAL RIGHTS OF STOCKHOLDERS—VOTING OF STOCK.
     Where by the law of the state each share of stock of a corporation is given one vote at meetings of stockholders, the general right of the holders of a majority of the stock to control the corporation follows as a legal consequence, and the right of the legal owner of stock to vote the same is a property right, in which he is entitled to be protected by the courts as against the doubtful claim of another to such stock.
     [Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, § 747.]

4. SAME—INTERFERENCE BY COURTS—UNWARRANTED GRANTING OF INJUNCTION.
     A court of equity is not warranted in granting an injunction, on an ex parte showing by a minority stockholder on the eve of a corporate election, restraining the legal holders of a majority of the stock from voting the same, with the result of giving the minority stockholders control of the corporation.

**5. SAME.**

An allegation in a bill by a stockholder of a corporation that other stockholders, made defendants, have conspired to elect a board of directors for the purpose of obtaining from such board a contract with the corporation by which they will make an exorbitant profit at the expense of the corporation and its other stockholders, affords no legal ground for an injunction restraining the defendants from voting their stock at the corporate election.

**6. SPECIFIC PERFORMANCE—PRELIMINARY INJUNCTION—GROUNDS—SUIT FOR SPECIFIC PERFORMANCE.**

A preliminary injunction should not be granted in a suit for specific performance of a contract where the contract is disputed or is uncertain in its terms, or the plaintiff's right sought to be protected is for any reason doubtful, nor where it does not appear that there is any danger of loss to complainant for which he cannot obtain compensation in damages.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Specific Performance, § 353.]

**7. SAME.**

In a suit for specific performance of an alleged contract for the sale to complainant of stock of a corporation to which defendant holds the legal title, the court should not grant a preliminary injunction on an ex parte showing which deprives defendant of his right to possession, and the incidental right to vote the stock, which he is entitled to exercise until an adverse determination on the merits.

**8. SAME—DISSOLUTION—UNFAIR USE BY COMPLAINANT.**

Two days before the annual election of directors by the stockholders of a corporation, complainant, who was its president, instituted a suit against certain of the defendants who were stockholders for the specific performance of an alleged verbal contract for the sale to him of a certain number of shares of stock. He also alleged that since making the contract they had conspired to purchase other stock, and thereby obtain control of the corporation for ulterior purposes detrimental to its interests. Without notice, and on an ex parte showing, an order was granted restraining defendants from voting any stock held by them, and restraining the corporation from allowing them to vote. Such order was by complainant's direction withheld until after the meeting had been organized with the necessary quorum, and then served; the result being to leave complainant and his supporters in control, although they held but about one-third of the stock. They refused to adjourn until a full hearing could be had before the court, and chose a board of directors who re-elected complainant president. *Held*, that the order was unwarranted to any extent on the case presented, and also in that it extended to stock not in litigation; that the use made of it by complainant was, moreover, unfair, and an abuse of legal process; and that it should be dissolved, especially where, on complainant's own showing, his right to relief on his alleged contract was doubtful.

Smythe, Lee & Frost, George Johnstone, Cothran & Dean, C. C. Featherstone, and W. R. Richey, for plaintiff.

Wm. G. Sirrine, for Laurens Cotton Mills.

Augustine T. Smythe, for F. J. Pelzer, Wm. M. Bird, Thomas R. McGahan, and W. W. Ball.

Simpson & Bomar, Ralph K. Carson, Adrian H. Joline, and Dial & Todd, for defendant.

BRAWLEY, District Judge. William E. Lucas was at the time of the commencement of this suit the president of the Laurens Cotton Mills. He was mainly instrumental in securing subscriptions to the capital stock, and since the organization, in 1895, has been its

president, conducting its affairs with ability and success. The company began to pay dividends on its stock in January, 1900, and has continued to do so; its stock selling above par, and the stockholders testifying to their satisfaction with the management by successive unanimous re-elections of the plaintiff as president and treasurer. The firm of Deering, Milliken & Co. is a commission house, which since 1899 has been the selling agents of the mills in New York, selling its produce on commission; S. M. Milliken being the head of the firm. Friction arose between plaintiff and said firm, who, for convenience, will hereafter be designated as the defendants, some time in 1904. It is difficult to fix precisely the time or the cause of this friction. It appears from the letters and affidavits that during the year 1904 various reclamations were made upon the commission merchants on account of alleged defects in the quality of the goods, and a letter of Milliken to Lucas, of November, 1904, shows that some persons, who, presumably at Milliken's request, had examined the mill, reported that the "machines showed lack of proper care, and some of the goods did not look very well." It also appears that Lucas had built some time about 1903 another mill, known as the "Watts Mill," of which he became president, somewhat against the opinion and advice of Milliken, and that he had taken some umbrage at Milliken's refusal to lend said mill what he called the "paltry sum of $100,000." However that may be, it is apparent that the relations between Lucas and the Millikens had become strained during the year 1904, and early in 1905 Lucas was beginning to look for another commission house which would sell the product of his mills at a lower rate of commission than that which the Millikens demanded; Lucas claiming that the commissions were exorbitant, and the Millikens claiming that that was the usual rate which they charged to the other mills in this section, of 16 of which they were the selling agents, and that they charged the same commission that other houses were charging for like services. It is not impossible that another cause of the inharmonious relation arose out of the condition of the Darlington Mill, of which Lucas was likewise the president, and the defendants the selling agents, to which mill they had advanced about $300,000, the settlement of which led to negotiations which culminated in the breach between the parties. On behalf of the plaintiff it is claimed that, as the result of these negotiations, he undertook to raise the money to pay off this indebtedness, all of which was not due, and that the defendants had agreed to allow a rebate of $25,000 on account of said indebtedness, and that S. M. Milliken at the same time, and as a part of the same negotiations, agreed to sell to the plaintiff 500 shares of stock of the Laurens Cotton Mills at $150 per share. On April 12, 1905, the plaintiff entered into an agreement with J. P. Stevens & Co. whereby they became commission agents of all the mills of which Lucas was president, upon terms which it is alleged were greatly more advantageous to the mills. The indebtedness of the Darlington Mills was discharged, and the connection of the defendants with these mills as selling agents was terminated. Cor-

respondence then ensued between plaintiff and defendants; the plaintiff demanding that Milliken should turn over to him the shares of stock which he claims that the latter had offered to sell, and notifying him that he had made arrangements with a bank in Greenville to pay therefor upon the receipt of the stock; Milliken denying that he had made any binding agreement to sell the stock, and refusing to sell the same.

S. M. Milliken for some years previous to April had been the owner and holder of 273 shares of stock in the Laurens Mills. G. H. Milliken was the holder of 24 shares, and S. D. Brewster of 92 shares. The parties named composed the firm of Deering, Milliken & Co., and S. M. Milliken, Jr., a physician, of New York, a son of S. M. Milliken, Sr., but not a partner in the firm, had for four or five years been the owner of 224 shares. After the breach with Lucas, S. M. Milliken began to purchase stock of the Laurens Mills, obviously for the purpose of obtaining control in co-operation with other stockholders who were friendly to him, and it appears from the affidavit of the secretary of the company that by May 15th he had bought and had transferred to him something over 600 shares of stock, in addition to that previously held. The plaintiff, Lucas, thereupon commenced a suit in the court of common pleas for Laurens against S. M. Milliken, S. M. Milliken, Jr., G. H. Milliken, S. D. Brewster, and Laurens Cotton Mills, setting forth, among other things, that the Laurens Cotton Mills is a corporation under the laws of South Carolina, having a capital stock of $350,000, represented by 3,500 shares, of the par value of $100 each, and that the plaintiff is the president of said corporation; that the defendant S. M. Milliken is a leading copartner in the firm of Deering, Milliken & Co. of which firm G. H. Milliken and S. D. Brewster are partners, and that S. M. Milliken, Jr., is the son of the leading partner; that on the 28th of March, 1905, the Darlington Mills was indebted to the firm above named in the sum of $300,000 and that in pursuance of negotiations between the plaintiff and said Seth M. Milliken, acting for the firm of Deering, Milliken & Co. the latter entered into a legal, lawful, and binding agreement with the plaintiff that in consideration of the payment in cash by the said Darlington Company, within 30 days, of the amount so owing, the said Seth M. Milliken would sell and deliver to the plaintiff 500 shares of the capital stock of the Laurens Cotton Mills at and for the price of $150 per share; that on the 12th of April said Lucas, acting as the president and the treasurer of the Darlington Company, did pay to the said firm the full amount due; that on the same day, to wit, the 12th of April, the plaintiff notified the defendant S. M. Milliken that he accepted the offer made by him for his shares of stock, and requested him to send the same to the City National Bank of Greenville, and he would remit promptly upon receipt of the same; that up to a recent period the said firm had been the agents of the Laurens Cotton Mills for the sale of its products, charging and receiving therefor a commission of 3 per cent. on the gross sales of print cloth, and 4 per cent. upon the gross sales of other products; that

plaintiff, in discharging his duty as president of said mills, and in the interest of economy, and in the interest of all the stockholders, submitted to said firm that the commissions so charged were exorbitant, and could and should be reduced, and, upon their refusal to comply with this reasonable request, the plaintiff, in the discharge of his duty, and for the best interest of all the stockholders, entered into arrangements with another commission house to sell the product of said mills at a commission not exceeding 2 per cent. upon the gross sale; that this arrangement was obviously greatly to the advantage of all stockholders of said mills, but was to the personal disadvantage of the said defendants, who took umbrage thereat, and did all they could to prevent the consummation of so beneficial an agreement. He thereupon charged that the other defendants named, including the partners and son of S. M. Milliken, were conspiring and confederating with said S. M. Milliken and other parties to the plaintiff unknown to vote the stock standing in their names for the common purpose of canceling and avoiding the beneficial agreement made by the plaintiff, for and in behalf of the stockholders of the said cotton mills, and again subjecting said corporation and the stockholders thereof to the exorbitant charges made by said firm, and that said S. M. Milliken, for the purpose of carrying out said illegal agreement and conspiracy, had recently purchased a large number of shares of stock of the Laurens Mills, for the purpose of effecting a change in the management, and putting in charge of said mill a management entirely amenable to their wishes and instructions. He demands judgment (1) that S. M. Milliken be required to perform specifically the contract for the sale of 500 shares at and for the sum of $150 per share; (2) that the defendant S. M. Milliken be enjoined and restrained from transferring or in any way changing the possession of 500 shares of stock, and from voting the same at any meeting of the stockholders of the defendant Laurens Cotton Mills; (3) that the other defendants named, and each of them, be enjoined from voting any and all shares of stock held by them, save under the direction of the court; (4) that the defendant Laurens Cotton Mills be enjoined from receiving and counting at any election the votes of any of said parties of any of the stock standing in their name; (5) for damages against S. M. Milliken by reason of his failure to specifically perform his contract in the sum of $50,000; (6) for damages against said S. M. Milliken and the other defendants for the damage so willfully, wantonly, and maliciously done to the plaintiff, in the sum of $50,000; (7) for such and other and further relief as is proper in the premises; (8) for his costs in this action.

Upon this complaint an order was made by his honor Judge Klugh, May 17th, enjoining and restraining S. M. Milliken from transferring or in any way disposing of the said 500 shares of stock specifically, and voting the same at any meeting of the stockholders of the defendant company. Said Milliken and all of the other defendants were also enjoined from voting any and all shares of stock held by them, and the Laurens Cotton Mills was enjoined from al-

lowing them to so vote. It was further ordered that defendants, or any of them, have leave, upon eight days' notice given to the plaintiff or his attorneys, to move before the court or any judge thereof to dissolve or modify the restraining order, provided that with notice of such motion said defendants serve a copy of the grounds and affidavits, if any, upon which such dissolution or modification was asked. It was further ordered that within five days plaintiff should file a bond in the sum of $1,000, conditioned for the payment of any damage which defendants, or either of them, might sustain by reason of the injunction granted, and further ordered that a copy of that order be served upon each of the defendants herein. It appears from the affidavit submitted that G. H. Milliken, one of the defendants named, was at Laurens on May 15th, and remained until the afternoon of May 16th, within the knowledge of the plaintiff, who signed certain certificates of stock which he had tendered for transfer, and that he remained in the state continuously to May 19th, at Laurens and at Spartanburg, and it was known that he had come to the state for the purpose of attending the annual meeting; that he returned from Spartanburg to Laurens at 1:30 p. m. on May 19th; and that the injunction was served on him about 5:30 p. m. The regular annual meeting of the company was held at Laurens on May 19th. A committee was duly appointed to ascertain whether a quorum was present, and reported that 3,404 out of 3,500 shares were represented in person or by proxy. The usual annual reports were submitted, and, after the transaction of the customary business, Mr. Smythe put in nomination the names of nine gentlemen as directors for the ensuing year. Mr. G. H. Milliken then stated that he desired to place in nomination the names of nine gentlemen for directors. At this juncture the deputy sheriff, who, it appears from the affidavit submitted, had been in waiting for some time, thereupon served Milliken with a copy of the order of injunction hereinbefore referred to. Mr. John B. Cleveland moved that the meeting be adjourned for eight or ten days. Mr. Dial moved to amend by moving to adjourn for the space of two weeks. On Mr. Cleveland's motion, as amended by Mr. Dial, the vote stood ayes 13, nays 20. The motion was therefore lost, and the meeting refused to adjourn. Mr. Cleveland then asked that Mr. Milliken's proxies be returned to him. This motion was refused. Mr. Cleveland then announced that Mr. Milliken and his friends proposed to withdraw from the meeting, and thereupon Mr. John B. Cleveland, the owner of 100 shares, Mr. Jesse Cleveland, the owner of 64 shares, Mr. W. S. Montgomery and Mr. D. B. Little, holders of a small number, all of Spartanburg, and Mr. N. B. Dial, holder of 130 shares, Mr. J. O. C. Fleming, owner of 76 shares, who heretofore had been directors of the company, resident at Laurens, and two other Laurens stockholders, withdrew from the meeting, and the directors nominated by Mr. Smythe, consisting of Mr. Lucas and his friends, were thereafter elected, receiving 1,293 votes. Mr. Lucas was thereupon elected president of the company. The Milliken defendants filed

their petition in the court of common pleas for Laurens county, June 6, 1905, for the removal of this cause to the Circuit Court of the United States, filing the usual bond in such cases provided, and shortly thereafter gave notice of motion to dissolve the injunction, and June 23d was the day fixed for the hearing of said motion. On June 19th the plaintiff, Lucas, served upon defendants' attorneys copy of petition to remand, and the two motions were heard June 23d and June 24th; many affidavits having been filed, and the case fully argued. I have deferred the consideration and determination of the case because of a statement that there were negotiations looking to an adjustment of the controversy, but, being now assured that a settlement is not probable, I will proceed to state my conclusions.

## On the Motion to Remand.

1. The parties in the suit are W. E. Lucas, plaintiff, a citizen of South Carolina; the Millikens, citizens of New York; Laurens Cotton Mills a citizen of South Carolina; and F. J. Pelzer and others, citizens of South Carolina, who, upon their own petition, were made parties defendant. The first question to be considered is the nature of the controversy, and whether it can be wholly determined between Lucas, on the one side, and the Millikens, on the other, without the presence of the other parties defendant, or, in the event that it should be considered that the others are necessary parties, whether their interest in the controversy is so far identical with the interest of the plaintiff, Lucas, that they will be grouped together on one side, without reference to their status in the pleadings. Examination of the complaint shows that it is framed with a double aspect. First, it is a suit for specific performance of a contract for the sale of 500 shares of stock to Lucas by Milliken at a price named; and coupled with that is a claim for damages to Lucas of $50,000 because of nonfulfillment. This is a controversy wholly between Lucas and the Millikens. The Laurens Cotton Mills, as a corporation, can have no possible interest in it. It can receive no benefit, and suffer no detriment, however it may be determined, and could not appeal from any judgment entered, if the real parties are satisfied. 1 Dan. Ch. Pl. & Pr. *230, states the rule in suits for a specific performance: "It is a general rule that none but parties to the contract are necessary to the suit;" and on page 296: "In a suit to ascertain the property in a certain share in a banking company, litigated between two claimants, the company is not a necessary party." Frye, on Specific Performance, § 79, says: "The general rule is that the parties to a contract are alone to be parties to the suit." Cook on Corporations, § 338, says: "In a suit by the claimant of stock to obtain the stock from another person, the corporation is a proper, but not a necessary, party."

Reeves v. Corning (C. C.) 51 Fed. 778, cited with approval in Dillon on the Removal of Causes, is to the effect that where one of the defendants is a mere stakeholder, or has interest on the same side with the plaintiff, the fact that he is a citizen of the same state

with the plaintiff will not defeat the right of his codefendant, with whom the real controversy exists, to remove the cause. Williamson v. Krohn, 66 Fed. 656, 13 C. C. A. 668, is on the same line.

Numerous cases have been cited by counsel for plaintiff to show that the corporation is an indispensable party. I have carefully examined them, and in my opinion the facts in each case differentiate them from that now under consideration.

In Kendig v. Dean, 97 U. S. 423, 24 L. Ed. 1061, the complainant was the owner of 184 shares of stock. During the Civil War the defendant obtained possession of the books of the company, and it was charged in the bill of complaint that, being so in possession, he wrongfully and fraudulently transferred upon the books of the company to his own name, as owner, the shares of complainant's stock. The relief asked was the restoration of the stock on the books of the company to the name of the complainant, and its recognition of his rights. The suit was brought against Dean, and the company was not made a party and the court held that the gaslight company was an indispensable party to the relief sought by this bill.

In St. Louis, etc., Railway Company v. Wilson, 114 U. S. 60, 5 Sup. Ct. 738, 29 L. Ed. 66, suit was brought by Wilson against the railway company and the Seligmans to compel the company to transfer to Wilson on its books certain shares standing in the name of the Seligmans, and to issue to him certificates therefor. The petition stated that Wilson had purchased the stock at a sale under an execution in his favor against the Seligmans, and that he had exhibited to the company his certificate of purchase, and demanded that it should cause his name to be entered on the stockbooks as the owner. The prayer was for the transfer of the stock, the cancellation of the certificates to the Seligmans, and the issue of new certificates to Wilson. The court held that the sole purpose of the suit was to establish the duty of the railroad company to transfer to Wilson the stock standing in the name of the Seligmans, and to enforce its performance; that the Seligmans were made parties only in aid of the principal relief which was asked for.

In Crump v. Thurber, 115 U. S. 56, 5 Sup. Ct. 1154, 29 L. Ed. 328, suit was commenced by Crump against Wilson and the dairy company; the complaint alleging that Crump had, under a contract with Wilson, assisted him in selling rights under a patent, by the terms of which Wilson was to receive $12,000 for the rights for Kentucky, and $8,000 for the rights for Indiana, and all received above those sums for either state was to be divided equally between Crump and Wilson; that the rights for Kentucky and Indiana were disposed of to the dairy company, and 1,000 shares of its capital stock, out of 2,000, were issued to Wilson in payment for the rights; that he refused to give to Crump any part of the money, but a large amount of the stock still stood on the books of the corporation in Wilson's name, and that Crump was entitled to 300 shares thereof; the petition praying that Crump should be adjudged to be the owner of this stock; that the corporation be ordered to cancel on its books the stock standing in Wilson's name, and to issue to

Crump certificates therefor. The corporation was served with process, and filed its answer, stating that one Thurber had bought Wilson's stock, and had received from him the certificates thereof, and had notified the corporation thereof, and claimed to have it transferred to his own name. Crump then amended his petition by making Thurber a party to the suit. Thurber answered, and filed his petition and bond for the removal to the United States court, he being a citizen of New York. On appeal to the Supreme Court of the United States, that Court held that in the controversy between Crump and Thurber the corporation was an indispensable party, and, as that was a Kentucky corporation, and Crump a citizen of Kentucky, the case could not be removed by Thurber.

In Wilson v. Oswego Township, 151 U. S. 56, 14 Sup. Ct. 259, 38 L. Ed. 70, the plaintiff was a citizen of Missouri, and the defendant a citizen of Kansas, and the controversy was between the plaintiff and defendant relative to the right of possession of certain bonds that were in the custody of the bank, which was a corporation of the State of Missouri. The court held that, the bank being a necessary party, the suit could not be removed to the federal court by its codefendant.

In Patterson v. Farmington (C. C.) 111 Fed. 262, Patterson, a citizen of Connecticut, brought a suit against a street railway company of that state, Coykendall and Soop, citizens of New York, and Greeley, a citizen of Connecticut, alleging an agreement with Coykendall to sell him certain mortgage bonds of a Connecticut corporation, the foreclosure of the mortgage, the purchase by the three parties named as trustees, the organization of the street railway company by subscription by them as trustees for the persons entitled to the bonds, which bonds were then represented by stock in the railroad company, and that no certificates had been actually issued by the street railway company, and that these parties intended to transfer the stock, and prevent plaintiff from obtaining his due portion of the same. He sought a decree against the trustees and an injunction, etc. The District Court held that the corporation was a necessary party.

In all of that line of cases where the corporation is held to be an indispensable party, either the principal relief sought is against the corporation for some wrong done by it, or the action is for the purpose of having the ownership of the stock in question recognized by the corporation, and the stock transferred on its books. Except in the Connecticut case, none are for specific performance, and in that case the stock had not been issued by the corporation, and the defendants therefore had no evidence of ownership which could be delivered to plaintiff if he succeeded in his suit.

In Cella, Adler & Tilles v. Brown (C. C.) 136 Fed. 439, Judge Sanborn reviews most of the cases above cited in a case where the complainants brought suit for specific performance against Brown Bros. & Co. and certain corporations—among them, the National Bank of Commerce, who had been appointed by Brown Bros. their agent to receive contributions of all the stockholders in a certain reorganization plan. The bill prayed that the proceedings in the at-

tempted reorganization be avoided for fraud, that Brown Bros. & Co. and the Bank of Commerce be required to deliver up to complainants their share of the pledged securities, and that Brown Bros. be enjoined from allotting their share to any other party. The case was removed from the state court, and, on a motion to remand, the court considered at some length a contention that the Bank of Commerce was an indispensable party, and, after reviewing most of the cases cited here, it held that the cause of action against Brown Bros. & Co. and the National Bank of Commerce was not joint; that the action against Brown Bros. to enforce their contract could be maintained without the presence of the Bank of Commerce, and its presence was not necessary to a complete adjudication of the controversy, and the complainants, by naming it as a party in their bill, and by asserting that it made a claim to have contributed and was entitled to a share of the pledged securities, could not make it a party to the contract of Brown Bros. & Co.; and, not being an indispensable party to the cause of action, he refused the motion to remand.

In this case there is but one controversy, and that is between Lucas and Milliken, growing out of an alleged breach of contract between the two. The bill seeks specific performance, and demands damages against Milliken. There is no cause of action against the corporation, and no relief is sought against it. Therein it differs from all of that class of cases considered by the court in Chesapeake & Ohio Railway Company v. Dixon, 179 U. S. 131, 21 Sup. Ct 67, 45 L. Ed. 121, where the complaint charged joint negligence of the defendant company and others, or the familiar cases of suits for joint trespass or for breach of a joint contract, where the court holds, as in Railroad Company v. Ide, 114 U. S. 52, 5 Sup. Ct. 735, 29 L. Ed. 63, Little v. Giles, 118 U. S. 596, 7 Sup. Ct. 32, 30 L. Ed. 269, and Powers v. Chesapeake & Ohio R. Co., 169 U. S. 92, 18 Sup. Ct. 264, 42 L. Ed. 673, and Mitchell v. Smale, 140 U. S. 406, 11 Sup. Ct. 819, 840, 35 L. Ed. 442, that defendant cannot make an action several which the plaintiff elects to make joint; that, while a separate defense may defeat a joint recovery, it cannot deprive the plaintiff of his right to prosecute his own suit to final determination in his own way, and that the cause of action is the subject-matter of the controversy; and that, for all the purposes of the suit, is whatever the plaintiff discloses it to be in his pleadings. In other words, in considering the plaintiff's cause of action on motion to remand, the court, in determining whether or not a separable controversy exists, will look only at the allegations of the plaintiff's complaint, and, in determining that question, will not consider matters of defense, and, if the complaint states a joint cause of action, either as joint negligence or joint trespass or breach of a joint contract, it cannot allow the defendant to make the action several which the plaintiff has elected to make joint; but the mere joinder of a party as a party defendant does not of itself show that a cause of action is joint where the allegations of the complaint show a cause of action against one defendant only. It is not contended here that the plaintiff has a cause of action against the Laurens Mills.

He has sought no relief against it. The contention is that the Laurens Mills is an indispensable party, because it is necessary to the fruition of any judgment against Milliken. The cases relied on must be considered in the light of the facts disclosed in each case, and wherever it appears, as it does appear in most of those cases, that the presence of a corporation as a party is essential to the securing of the relief which the plaintiff seeks, the courts are governed accordingly; but I am of opinion that these cases are not authority for the proposition that the corporation is a necessary part" to a suit for the specific performance of a contact for its issued stock.

There is no allegation that the Millikens are insolvent, nor is there any doubt that the plaintiff will obtain the full fruition of any decree to which he may show himself to be entitled. The case might be otherwise if the complaint alleged that the defendants were about to dispose of their stock, and it was necessary to enjoin a transfer in order to prevent the stock being put beyond the control of the defendants or of the court, but the gravamen of the complaint is that the defendants have bought the stock for the purpose of controlling the company. If the plaintiff should succeed in his suit, and obtain a decree for specific performance of the contract for the transfer to him of 500 shares, he is the president of the company, and it is idle to say that he would not obtain the fruits of his victory. The only prayer in the bill against the corporation is that it be enjoined from receiving and counting any votes of the Millikens at the stockholders' meeting, but, as the bill seeks to enjoin the Millikens from voting, any decree against the company would be a matter of form, and not of substance. This was decided in Higgins v. B. & O. R. Co. et al. (C. C.) 99 Fed. 640, which was a bill filed by citizens of New York in the Circuit Court of Pennsylvania against a Maryland and a Pennsylvania corporation, and, the case having been removed to the United States Court, a motion was made to remand. It was alleged in the bill against the Baltimore & Ohio Company that its ownership of stock in the Pittsburg & Western Company, was ultra vires, and the prayer was that such stock be sold, and pending the sale the Baltimore & Ohio Company enjoined from transferring it and from voting it. The court says:

"It will thus be seen, if these prayers be granted, the full measure of the relief sought will be obtained by a decree against the Baltimore & Ohio Company alone. It is not sought to include or join the Pittsburg Company in such decree, and its corporate rights or property are not affected thereby. It will therefore seem clear that both by the subject-matter of the bill, and the specific relief sought thereunder, a separate controversy is presented. * * * It is true, the fourth prayer seeks a decree against the Pittsburg & Western Railway Company, but the bill shows no complaint or cause of action against that corporation. It is evident its relation to the case is merely formal. A decree against it would be a formal sequence to the third provision of the decree sought against the Baltimore & Ohio Company for, clearly, if the Baltimore Company were enjoined from voting the stock, the further enjoining the Pittsburg Company from receiving or voting already enjoined would be a matter of form, not substance, and would neither add to nor detract from the all-sufficient decree against the Baltimore Company."

2. But even if I were of the opinion that the Laurens Mills was an indispensable party, it would not follow that the case should be remanded, because it is well settled by repeated adjudications of the Supreme Court of the United States that in a controversy between citizens of one state on one side, and citizens of another state on the other side, a case may be removed without regard to the position they occupy in the pleadings as plaintiffs or defendants; that the court will look at the pleadings, and determine on which side of the controversy the codefendant whose citizenship is asserted as a ground for nonremoval stands, and the fact that such defendant is a citizen of complainant's state does not prevent the case from being removed, where the interest of such codefendant is identical with that of the complainant. This requires consideration of the second aspect of the plaintiff's case. As we have already said, the complaint sets forth two grounds. The first relates solely to his personal claim against S. M. Milliken for specific performance and breach of contract relating to 500 shares of stock. With that controversy neither the defendant company nor the other defendants have any concern. His second cause of action states that Lucas, as president of the Laurens Mills, has made an arrangement with another commission house for the sale of its products at a commission not exceeding 2 per cent. on gross sales, which arrangement, he states, was obviously greatly to the advantage of the company; and the charge is made that S. M. Milliken conspired with the other defendants and with other parties unknown for the purpose of obtaining control of the Laurens Cotton Mills; of canceling, if possible, and avoiding this beneficial contract, and thereby subjecting the said corporation and the stockholders thereof to the exorbitant charges of Deering, Milliken & Co. Obviously the Laurens Cotton Mills has an interest in this controversy, but its interest is precisely that of the complainant, Lucas. This appears upon the face of the complaint, but in determining a question of this nature the court is not limited to an examination of the complaint alone. Its duty is to ascertain the truth. The first counsel who addressed the court in behalf of the plaintiff on these motions was Mr. Featherstone, who frankly avowed that his sympathies were altogether with the plaintiff, and although he had appeared for the Laurens Cotton Mills, and had prepared its answer, he had since that time substituted other counsel as attorneys for the company who had prepared an amended answer. The answer of the company did not appear in the record certified by the clerk of the state court, but, it appearing that it had been served before the petition for removal, the court ordered—plaintiff's counsel objecting—that a copy of the answer be attached to the record. The original answer was exhibited upon the hearing, and it appears that it was served on June 5, 1905. The third paragraph of that answer is as follows:

"The said defendant, further answering, says that it has for a number of years been paying excessive and unnecessary commissions on the sale of its goods, amounting to about $15,000 per annum; that within the last few months it has succeeded in getting the output of its mills sold for about one half of the former rate paid; and that said arrangement is now in existence."

In so far, then, as the object of the plaintiff's bill was to protect the company from the alleged conspiracy of the Milliken defendants, which was designed to reimpose upon it "excessive and unnecessary commissions," and to cancel the beneficial contract alleged to have been made for commissions to be paid at about one-half of the former rate, the Laurens Cotton Mills have the same interest that the plaintiff avows.

In the Removal Cases, 100 U. S. 468, 25 L. Ed. 593, the court held that:

"Either party to the controversy may remove the suit to the Circuit Court, without regard to the position they occupy in the pleadings as plaintiffs or defendants. For the purpose of the removal, the matter in dispute may be ascertained, and the parties to the suit arranged on opposite sides of the dispute. If, in such arrangement, it appears that those on one side were all citizens of different states from those on the other, the suit may be removed. Under the old law the pleadings only were looked at, and the rights of the parties in respect to removal were determined solely according to the position they occupied as plaintiffs or defendants in the suit. Under the new law the mere form of the pleadings may be put aside, and the parties placed on different sides of the matter in dispute according to the facts."

In Barney v. Latham, 103 U. S. 214, 26 L. Ed. 514, the court, considering a removal case where the plaintiffs were citizens of Minnesota, and defendants citizens of New York and other states, and a corporation of Minnesota, held that the mere form of the pleadings was immaterial and was to be disregarded; that in that case the land company, as a corporation, had no necessary connection with the controversy, and, although it might be a proper, was not an indispensable, party to the relief asked; and in Harter v. Kernochan, 103 U. S. 566, 26 L. Ed. 411, in a suit which involved the liability of a township in the state of Illinois, the court says:

"Disregarding, as we may do, the particular position, whether as complainants or defendants, assigned to the parties by the draftsman of the bill, it is apparent that the sole matter in dispute is the liability of the township upon the bonds; that upon one side of that dispute are all of the state, county, and township officers and taxpayers that were made parties, while upon the other is Kernochan, the owner of the bonds whose validity is questioned by this suit. He alone of all the parties is in a legal sense interested in the enforcement of liability upon the township. It is therefore a suit in which there is a single controversy, embracing the whole suit, between citizens of different states, one side of which is represented alone by Kernochan, a citizen of Massachusetts, and the other by citizens of Illinois."

These cases arose under the removal act of 1875. The acts of 1887–88 does not affect this question. There have been numerous decisions since its date repeating the same doctrine. It is useless to cite them all. The latest decision is that of the Circuit Court of Appeals of the Eighth Circuit, March 4, 1905 (Boatmen's Bank v. Fritzlen, 135 Fed. 658), where Judge Sanborn says:

"The positions assigned to parties in a suit by the pleader are immaterial in determining the removability of the cause. It is the duty of the national court to ascertain the real matter in dispute, to arrange the parties on opposite sides of it according to the facts and their respective interests, and then to determine whether or not a controversy exists between citizens of different states which involves the jurisdiction of that court."

It appearing, then, that, in so far as the Laurens Cotton Mills has any interest whatever in this controversy, its interest is on the same side with Lucas, I am of opinion that its joinder as defendant with the Millikens does not prevent the removal of the suit by the Millikens. The same remark, of course, applies to Messrs. Pelzer and others, who were made parties defendant on their own petition for the purpose of aligning themselves alongside of the plaintiff.

It has been strongly pressed upon me that, inasmuch as there may be a question of doubt whether this cause was properly removed, it is the duty to remand it to the state court. If I had grave doubts as to my jurisdiction, I would not assume it, for I do not covet jurisdiction, and there are many reasons why I would prefer not to be compelled to decide this case, and had well hoped to avoid that necessity by giving the parties opportunity to adjust their controversies; but the Constitution and laws of this country give to its citizens the right to a hearing in the courts of the United States of certain controversies which arise between the citizens of different states, and the parties here are entitled to the protection and preservation of that right.

The case presents the unusual spectacle of a party representing a little more than one-third of the capital stock of a corporation controlling absolutely its affairs, and excluding from all participation therein the owners of nearly two-thirds of its stock. Prior to 1860 there were in South Carolina various checks and safeguards designed to prevent, in its political affairs, the control of a mere numerical majority, and the same principle obtained with respect to corporations. Nearly all of the charters granted up to that time provided that stockholders should be entitled to vote according to a scale which was so arranged that no holder was entitled to more than a certain number of votes, but for the last 40 years the fixed policy of the state has been to give to the majority of stockholders the right to control the affairs of a corporation in which they are interested, each share of stock representing the right which the owner has in the management, profits, and ultimate assets of the corporation, and the certificate held by him is prima facie evidence of his title and ownership. Nothing, therefore, can be more clear than that at this date in South Carolina the holders of a majority of the stock of a corporation are entitled to control it. The right to vote one's stock is a right of property, and should be as sacred as any other property right. Now, it is undisputed that the Millikens and their friends own nearly two-thirds of the stock of this corporation, and they would be in control of it to-day if an order of injunction obtained without notice upon the ex parte affidavit of the plaintiff two days before the meeting, service of which was designedly withheld until the meeting to which they were invited as stockholders was organized, and in which their presence as stockholders was necessary to make a quorum. In these circumstances, a deputy sheriff, lying in wait until the moment of election arrived, served the order of injunction which restrained not only the voting of the 500 shares about which there was a dispute, but all of the stock held by the defendants, some of which had been

bought subsequent to the alleged contract in open market, under the sanction of the laws, and 247 shares of which had been held for more than four years by one of Milliken's sons, who was not a member of his firm or a party to any of the plaintiff's negotiations. All of this is done under the guise of preserving the status quo until certain legal questions arising out of an alleged contract for the purchase of certain shares can be determined. The case for the plaintiff is that in consideration of the payment by the Darlington Manufacturing Company of its indebtedness of $300,000, a part of which was not then due, and through his exertions (he being its president), S. M. Milliken, acting for the firm of Deering, Milliken & Co., would allow a rebate of $25,000 to that company, and as a further consideration, would sell to Lucas individually 500 shares of Laurens Cotton Mills stock at $150 per share. Milliken denies making such agreement, and submits that any such agreement was without consideration, and was otherwise void. That a bill will lie for the specific performance of a contract for the sale of stock, although once doubted, is no longer open to question; but the contract thus sought to be enforced must be a legal and binding contract, certain and definite in all its terms. Whether Milliken's offer was binding, and whether there was such part performance as to take it out of the statute of frauds, can be determined finally only after a full hearing, but that there is uncertainty as to the number of shares that it is alleged that Milliken agreed to sell is apparent. There was no offer in writing, and plaintiff claims that S. M. Milliken was then acting in behalf of the firm of Deering, Milliken & Co., and such consideration as is alleged was the payment of the debt of the Darlington Mills to that firm. Now, at that time S. M. Milliken owned 273 shares; his partner, G. H. Milliken, owned 24 shares; and S. D. Brewster, 92; the firm owning in all 389 shares. On April 12th Lucas writes to Milliken as follows:

"I have arranged to accept your offer for your holdings in the Laurens Mills at the price asked by you, namely, $150 per share. I will take also the holdings of Messrs. S. M. Milliken, Jr., G. H. Milliken, S. D. Brewster and Mrs. Hatch at the same price. I will ask you to please send this stock to the City National Bank, Greenville, S. C., and they will remit you promptly on receipt of same."

In the correspondence that ensued there is no mention anywhere of any agreement to sell 500 shares of stock. Lucas insists upon Milliken's standing by his agreement, and Milliken replies that he does not make offers to stand open unless it is so agreed at the time; but, to ascertain what the offer was, we must turn to Lucas' letter, above cited, where is found the only reference in writing to the alleged contract. The offer, as therein stated, is, "your holdings," which were 273 shares; and then follows an offer by Lucas, not accepted by the parties, for the holdings of Messrs. S. M. Milliken, Jr., G. H. Milliken, S. D. Brewster, and Mrs. Hatch, at the same price. If the holdings of S. M. Milliken, Jr., and Mrs. Hatch are added to those of the firm, there would be more than 500 shares. So far as appears in the papers before me, it was not until May 15th, when the bill was filed, that any claim was made

that there was an agreement to sell specifically 500 shares of stock. By that time Lucas knew that there was to be a contest for control of the mill, and he doubtless knew how many shares of stock could be relied upon to support him. If to these were added S. M. Milliken's holdings at the date of the alleged contract, he would still fall short of a majority. In the letter inclosing drafts in payment of the debt of the Darlington Mills there is no mention or claim that the same is intended to be in part performance of any contract for the sale of any stock in the Laurens Mills. So the prima facie case for the plaintiff seems to be this: That he was desirous of changing his commission agents, and placing the accounts of the three mills of which he was president in other hands, and before making such change it was necessary to arrange for the payment of the indebtedness of the Darlington Mills, then amounting to a large sum; that Milliken agreed to allow him a considerable rebate on the debt of the Darlington Mills if it was paid, and at the same time, not desiring to hold stock in mills of which he was no longer the agent, he made an offer to sell his stock at $150 per share. But this was a verbal offer; no definite time being fixed for its acceptance or rejection, and no definite number of shares being named. As a general rule, an offer to sell, if not accepted at the time when made, may be withdrawn. It is equally a rule of law that an agreement without consideration cannot be enforced, and that a court of equity will not enforce a contract, any of the terms of which are vague, uncertain, and doubtful. It must be sure that the minds of the parties have met and mutually agreed, and, where any of these requisites are lacking, specific performance will be denied. Whether the uncertainties which now appear may be made certain by proof, and whether there has been sufficient part performance to take the case out of the statute of frauds and warrant a decree for specific performance, can only be determined when the proof now lacking is supplied; but, upon the case now made, the plaintiff has shown no ground whatever for holding Milliken to any agreement for the sale of more than 389 shares, assuming that at the time of the agreement he offered to sell his own holdings and those of his partners. Would such an agreement, if legally binding, deprive Milliken of the right to vote this stock? This would depend upon the agreement. A mere option or an executory contract for the sale of stock would not ordinarily deprive the owner of his right to vote it, for the right to vote is incident to the ownership, and remains with the legal holder.

One of the counsel for plaintiff, apparently recognizing this difficulty, seems to rest the case upon the doctrine that Lucas has an equitable title to the stock. If he had paid for it, he would have an equitable title which would enable him to restrain the holder of the legal title from the exercise of any of the rights of ownership, but that is not the case. He has paid nothing on account of the purchase of the stock. All that he claims is that he has an agreement which gives him an equity for specific performance, and a court might very well conclude that he has made out such a prima facie case as would entitle him to enjoin the Millikens from selling

or disposing of the stock until the question of his right to buy the stock at a certain price is determined. But an injunction which deprives Milliken of his right to vote his stock, which in effect is like a judgment entered before trial and without a hearing, is a very different case. Plaintiffs contend that this injunction was necessary to preserve the status quo. The general authority of courts of equity to grant injunctions pendente lite, so as to preserve the subject of the controversy until opportunity is given for full investigation, is a power in aid of justice, and most beneficial; but this powerful and peremptory instrumentality cannot be used to take property out of possession of one of the parties except under very extraordinary circumstances, where there is some pressing necessity to avoid injurious consequences that cannot be compensated in damages, and where the right is established with a certainty of proof that leaves no doubt. Acknowledged rights are more entitled to the protection of courts than the establishment of new and doubtful ones. The right of a majority of stockholders to control the corporation is an acknowledged and undisputed right, established by every legal sanction. That was the status quo that should have been preserved, but this order of injunction, obtained and executed in the manner already recited, had no other purpose and no other effect than to destroy the status quo which consisted in the right of the majority to control the corporation.

A case frequently cited is Hilles v. Parrish, 14 N. J. Eq. 390, where a bill was filed to restrain certain stockholders from selling or assigning their stock, or from voting upon it at an election which was to be held within three days from the date of the filing of the bill. The court held that inasmuch as the probable effect of the injunction would be to change the result of the election and control of the affairs of the company, without allowing the stockholders sought to be restrained to be heard in their own defense, the injunction ought to be denied. Precedents may be found where elections are enjoined until questions relating to the ownership of stock can be determined, but no case has been cited, and after exhaustive search I have been unable to find any, where on the eve of an election a minority has, on an ex parte application, obtained an injunction tying the hands of a majority, with the result of giving such minority control of the corporation. None of the cases cited in behalf of the plaintiff give support to any such doctrine. It would prolong this opinion to undue length if these cases were critically analyzed to show how far they fall short of giving color even to such a pretension. The only ground upon which it is sought to support it is that, if Milliken and his friends secure control of the corporation, they will abrogate the contract with Stevens & Co., and secure for themselves the business of the company at exorbitant rates of commission. Nobody knows better than the counsel who make this contention that a court of equity would not hesitate to enjoin a transaction of such nature. There is nothing better settled than that a majority of stockholders controlling a corporation will not be allowed to make a contract with themselves for undue profit at the expense of the corporation. There is nothing to justify the

assumption that the Millikens are so unwise or so dishonest as to make such an attempt, and, if they were, it could easily be prevented. Hence the claim that there was danger of irreparable damage to the corporation if the injunction was not granted may be dismissed as scarcely worthy of consideration, and it is only upon the ground of danger of irreparable injury which could not be adequately compensated in damages that an injunction pendente lite in a case of this nature could ever be properly asked. So far, then, as the corporation is concerned, it is perfectly clear that there is no legal ground upon which the injunction can be sustained. It is an unheard-of thing that stockholders of a corporation can be enjoined from voting on the ground that the persons they may vote for to manage it may possibly abuse their trust.

We come now to the consideration of the rights of the plaintiff individually. The purpose and effect of the injunction was to secure the re-election of Lucas as president of the Laurens Cotton Mills. Can the great powers of a court of equity be properly invoked for such an object? It is scarcely necessary to say that the president of a joint-stock company has no indefeasible title to his office beyond the term for which he has been regularly elected, whatever may be his merits. The majority of the stockholders have the right, at the expiration of his term, with reason or without reason, to refuse to re-elect him; and courts have no right to inquire into the motives of such stockholders, or to interfere with their discretion. Lucas well knew about the middle of April, after the breach between himself and Milliken, that the latter denied that he was under any obligation to sell his stock in the Laurens Mills. He refused absolutely to do so, and shortly afterwards began to purchase additional stock. There was apparently no concealment of such purchases, and it must have been obvious to Lucas, as to all the world, that there would be a contest for the control of the company at the annual meeting, May 19th, and the issue of that contest would necessarily depend upon the preponderance of the holdings on one side or the other; and it appears that by May 15th Milliken had added to his holdings by purchase something over 600 shares of stock, which, with the holdings of the local stockholders in Spartanburg and Laurens, the Messrs. Cleveland, Montgomery, Dial, Fleming, and others, gave to the opposition to the Lucas management a large majority of the stock—nearly two-thirds, in fact. If the object of this suit and of the injunction was to test the legal rights of the plaintiff under the alleged contract and claim for specific performance, no good reason is shown or is conceivable why the order of injunction should not have been served immediately after it was made. The party upon whom it was ultimately served was in the state, within reach of process, at the time the order was obtained. It was designedly withheld, and nothing was done to indicate to Milliken and his friends that the annual election would be anything other than the normal proceeding whereby a majority of the stockholders would be enabled to exercise the indubitable right of the majority to elect a board of directors in consonance with their views. After the service of the injunction in the

139 F.—53

manner and at the time as already recited, it was still within the power of the plaintiff and his friends to give to Milliken and his friends what, in the parlance of the day, is called a "square deal." Mr. Cleveland and Mr. Dial, large stockholders—the latter a director of the company—asked for an adjournment for two weeks. This would have given opportunity to the defendants to appear before the judge who granted the order to move to dissolve or modify it, for the restraining order expressly provided for such leave upon eight days' notice. The order was obtained without notice upon an ex parte showing, and, if the plaintiff believed that he had right on his side, every consideration of fairness required that the defendants should have an opportunity to be heard before they were deprived of a substantial right, for the right to vote is inherent, but this reasonable request was refused. The injunction not only restrained the voting of the stock, concerning which it might fairly be claimed that there was a dispute, but all the stock held by the defendants, or any of them, their right and title to which was indisputable, with the result that a board of directors was chosen by a minority, and the holders of nearly two-thirds of the stock of the company are excluded from all participation in its management.

The jurisdiction of a court of equity to grant preliminary injunctions or injunctions pendente lite is well settled. It is not a matter of strict right, and the limitations of this power are tolerably well defined. The general rule is stated in Pelzer v. Hughes, 27 S. C. 415, 3 S. E. 781, as follows:

"The sole object is to preserve the subject of controversy in the condition in which it is when the order is made until an opportunity is afforded for a full and deliberate investigation. It cannot be used to take property out of the possession of one person and put it into that of another."

In 16 A. & E. Ency. of Law, 347, numerous cases are cited, and there is a summing up which correctly states the rule:

"(3) The power to grant preliminary injunctions should be exercised with great caution, and an injunction should not be granted except in cases of the most urgent necessity. Interference by injunction rests on the principle of a clear and certain right to the enjoyment of the subject-matter in question, and an injurious interruption of that right, which, on just and equitable grounds, ought to be prevented. The rule that great caution should be exercised is especially applicable in the granting of preliminary injunctions on an ex parte hearing, as experience shows that an ex parte statement seldom presents the full truth."

And again, on page 360 of the same volume:

"To warrant the allowance of a writ of injunction, it must clearly appear that some act has been done or is threatened which will produce irreparable injury to the party asking an injunction."

Applying these well-settled principles to this case, it seems to me that the injunction should not have been granted, for the following reasons:

(1) Plaintiff's right to claim specific performance is, to say the least, doubtful. The agreement is disputed, the number of shares covered by it is uncertain, and its legality is impeached. "An injunction will not usually be granted where the complainant's right is doubtful. Where the right of the party is doubtful an injunction

will not, in general, be granted to prevent an interference therewith until the right is established by law. Nothing is better settled as a rule of equity procedure than that the complainant is not entitled to a preliminary injunction to protect a right which depends on a disputed question of law, and which question has never been adjudged in his favor by a court of law. When the principles of law on which rights are disputed will admit of doubt, a court of equity, although satisfied as to what is the correct conclusion of law upon the facts, will not, without a decision of the courts of law establishing such principles, grant an injunction. So, if the facts on which the right to injunction is based are in dispute, the injunction will not be granted." 16 A. & E. Ency. of Law, 359. Spelling, on Extraordinary Relief, states the rule thus (section 207): "An injunction will not issue where the right to protect which the injunction is claimed depends upon a doubtful and disputed question of law," nor where it would have the effect of interfering with the legitimate use and enjoyment of property.

(2) There was no danger of irreparable damage to plaintiff, or of any injury which could not be compensated by damages. The plaintiff's loss of the presidency of the company is not such an irreparable injury, for, if he should succeed in his suit, and show that he was entitled to sufficient stock to have given him control and secure his re-election, he could recover from the defendants, as damages, not only for his loss of salary, but for any other loss as stockholder which he has suffered by reason of a change of management; and the law is well settled that an injunction will not lie in any case where the plaintiff can obtain adequate pecuniary compensation for the injury complained of. It is not disputed that the defendants are amply solvent and able to respond in damages. If they had obtained control of the Laurens Mills they could not have removed it beyond the jurisdiction of the court, or have inflicted upon it or upon the plaintiff any injury for which they would have been unable to respond in damages.

(3) As the sole object of the preliminary injunction is to preserve the subject-matter of the controversy in the condition in which it is until the merits can be heard, an injunction should never be granted upon an ex parte application, the effect of which is to deprive the party enjoined of his right of property to the thing in dispute. The object of this suit is to determine the right of property in certain stock held by the defendants. Until that right is decided adversely to them, they are unquestionably entitled to the possession of the stock, with all of its incidents, among which is the right of voting it. The effect of this injunction is to deprive them of such possession. Not only that, but the right to other stock, the title to which was not disputed, was taken away from them. The subject-matter of controversy, which it is the sole object of the preliminary injunction to preserve in the condition in which it is until the merits can be heard, is not left in statu quo. To all intents and purposes, this injunction ties the hands of defendants as completely as would be the case if there had been a final decision against them on the merits. They are deprived of their property for all purposes of

voting and exercising rights of ownership as effectually as if their certificates of shares had been actually sequestered.

(4) There was no case of urgent necessity which required that a court should, upon an ex parte application, make an order, the effect of which was to allow a minority of stockholders to obtain control of property against the will of the majority. The case would be different if the election had been enjoined until the question of the right to vote the disputed stock could be heard. In such case the old administration would have held over until defendants had a hearing. Or, even after the injunction had been served, common fairness required acquiescence in the motion of Mr. Cleveland and Mr. Dial to adjourn the meeting for two weeks, in order that defendants might be heard, before all their rights were taken from them. But the plaintiff and his friends, having obtained their vantage ground by such use of the court's process as merits severest condemnation, securing thereby a nominal majority, and having as their motto, "Beati possidentes," were determined not to surrender the advantage thus unfairly obtained, and to take their chances in the lottery of litigation to maintain it. The numerous, astute, and industrious counsel for plaintiff have cited no case which sustains this injunction, or which comes near it, and there is no support for it in principle. It remains, therefore, to take brief notice of the appeal urged with some vehemence, that the plaintiff should be supported because he had made a fight in behalf of the Southern mills against Northern commission houses, or, as one of the counsel given to military metaphors has expressed it, that this is the first battle in the war for Southern industrial independence. These are considerations that might very well have been addressed by Lucas to the stockholders of his company—that it was their duty to stand by him in the contest which he alleges he was making in their interest—but such appeal does not appear to have been effective. The Clevelands, Montgomerys, Flemings, Dial, Todd, and others, all of whom are interested in Southern mills, are aligned with the defendants in the desire for a change in the management of the Laurens Mill, and considerations of this nature surely have no place in a court of law, as furnishing motives of decision.

In reaching the conclusion that this injunction should be dissolved, I have not considered the charges of misconduct set forth in the affidavits as reasons why the defendants do not regard the plaintiff a safe man for the presidency of this mill. Stockholders are not required to give reasons for a desire for a change of management. Nor has it been necessary to consider the charges made by Lucas that the defendants had been receiving exorbitant commissions. Where both parties are free to choose, the amount paid for personal service is a matter of bargain, or regulated by the usages of the trade, and generally beyond the cognizance of the courts, unless the charges are so unconscionable as to shock the conscience. As a rule, the character and standing of a commission house, its probity and financial responsibility, its experience, its clientage, its ability to find purchasers where others not so well known would fail, are all elements which enter into the determination of the question

whether the commissions charged are reasonable or otherwise. There is no infallible standard of measurement or rule of law which governs, and it is not the province of courts to balance the probabilities of profitable results likely to arise from the following of one or another plan in the management of a business. If the defendants charged the same commissions to this company which they charged other companies for like services, and the same that other houses of like standing charged other companies in like plight, it cannot help the plaintiff's cause to vilipend them as extortioners. On the other hand, the plaintiff was entirely within his right, and deserves nothing but commendation, if, believing that the rates of commission were too high, he endeavored to secure a reduction therein, and, failing that, transferred the business to another house. It may be his misfortune, and not his fault, that he was unable to persuade a majority of his stockholders of the wisdom of such change. It is not an uncommon lot of pioneers to be overtaken by disaster, and success is not always the criterion of merit. To have deserved it is sometimes better than to have attained it. But the question of the plaintiff's merits or demerits as a manager of an industrial enterprise which apparently he had hitherto conducted with conspicuous success is not before me for decision. That for which he is to be condemned is that, having invited a contest for the control of the mill, which all the rules of the game required to be fairly played, he has won it by having an injunction up his sleeve.

It is ordered, adjudged, and decreed that the order of injunction of May 17, 1905, restraining the defendants from voting the stock held by them, and restraining the Laurens Cotton Mills from receiving the votes of said defendants, be, and it hereby is, dissolved. It is further ordered and adjudged that the defendants S. M. Milliken, G. H. Milliken, and S. D. Brewster, members of the firm of Deering, Milliken & Co., be, and each and every one of them is, hereby restrained and enjoined from selling or otherwise disposing of any and all shares of stock in the Laurens Cotton Mills held by the firm of Deering, Milliken & Co. or by said parties individually, on April 12, 1905, until the further order of this court.